JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Trident E&P, LLC

## DEFENDANTS

HP, Inc. and HPI Federal, LLC

**(b)** County of Residence of First Listed Plaintiff    Montgomery County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Santa Clara County
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Silverang, Rosenzweig & Haltzman, LLC; 900 E. 8th Ave.,
Suite 300, King of Prussia, PA 19406; 610-263-0115

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☐ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 U.S. Government Defendant | ☒ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*    *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 880 Defend Trade Secrets | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☒ 370 Other Fraud | ☐ 710 Fair Labor Standards | Act of 2016 | (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | **SOCIAL SECURITY** | Protection Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | ☐ 863 DIWC/DIWW (405(g)) | Exchange |
| | Medical Malpractice | | Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 870 Taxes (U.S. Plaintiff | Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | or Defendant) | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party | ☐ 899 Administrative Procedure |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | 26 USC 7609 | Act/Review or Appeal of |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | Agency Decision |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | ☐ 950 Constitutionality of |
| | Other | ☐ 550 Civil Rights | Actions | | State Statutes |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332

Brief description of cause:
Tortious Interference with Contract

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
UNDER RULE 23, F.R.Cv.P.

DEMAND $
$425,000,000.00

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE       DOCKET NUMBER

DATE
August 2, 2022

SIGNATURE OF ATTORNEY OF RECORD
/s/ William C. Katz

**FOR OFFICE USE ONLY**

RECEIPT #      AMOUNT      APPLYING IFP      JUDGE      MAG. JUDGE

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

I.(a)   **Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

  (b)   **County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

  (c)   **Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.   **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
    United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.
    United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
    Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
    Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked**.  (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

III.   **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

IV.   **Nature of Suit.**  Place an "X" in the appropriate box.  If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable.  Click here for: Nature of Suit Code Descriptions.

V.   **Origin.**  Place an "X" in one of the seven boxes.
    Original Proceedings.  (1) Cases which originate in the United States district courts.
    Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
    Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.
    Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.
    Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.
    Multidistrict Litigation – Transfer.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
    Multidistrict Litigation – Direct File.  (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
    **PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.**  Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

VI.   **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

VII.   **Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
    Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
    Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.   **Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____ 320 Circle of Progress, Pottstown, PA 19464 _____

Address of Defendant: _____ 1501 Page Mill Road, Palo Alto, California 94304 _____

Place of Accident, Incident or Transaction: _____ Pottstown, Pennsylvania _____

---

**RELATED CASE, IF ANY:**

Case Number: _____ Judge: _____ Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court? — Yes ☐ No ☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court? — Yes ☐ No ☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court? — Yes ☐ No ☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual? — Yes ☐ No ☑

I certify that, to my knowledge, the within case ☐ is / ☑ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 08/02/2022 _____ /s/ William C. Katz _____ 205086

*Attorney-at-Law / Pro Se Plaintiff*     *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.**     *Federal Question Cases:*

☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
☐ 2. FELA
☐ 3. Jones Act-Personal Injury
☐ 4. Antitrust
☐ 5. Patent
☐ 6. Labor-Management Relations
☐ 7. Civil Rights
☐ 8. Habeas Corpus
☐ 9. Securities Act(s) Cases
☐ 10. Social Security Review Cases
☐ 11. All other Federal Question Cases
    *(Please specify):* _____

**B.**     *Diversity Jurisdiction Cases:*

☐ 1. Insurance Contract and Other Contracts
☐ 2. Airplane Personal Injury
☐ 3. Assault, Defamation
☐ 4. Marine Personal Injury
☐ 5. Motor Vehicle Personal Injury
☐ 6. Other Personal Injury *(Please specify):* _____
☐ 7. Products Liability
☐ 8. Products Liability – Asbestos
☑ 9. All other Diversity Cases
    *(Please specify):* ___ tortious interference/fraud/defamation ___

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, _____ William C. Katz _____ , counsel of record *or* pro se plaintiff, do hereby certify:

☑ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☐ Relief other than monetary damages is sought.

DATE: 08/02/2022 _____ /s/ William C. Katz _____ 205086

*Attorney-at-Law / Pro Se Plaintiff*     *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5/2018)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **Trident E&P, LLC,** | |
| **Plaintiff,** | **Case No.** |
| **v.** | _____ |
| **HP, INC.** | |
| **and** | |
| **HPI FEDERAL, LLC,** | |
| **Defendant.** | |

## **COMPLAINT**

Plaintiff Trident E&P, LLC ("Trident" or "Plaintiff") brings this Complaint against defendants HP, Inc. ("HP") and  HPI Federal, LLC ("HPI," and collectively with HP, the "Defendants"), and avers as follows:

### **Introductory Statement**

This action seeks recompense for the Defendants' illicit and actionable conduct that caused the Defense Logistics Agency ("DLA") to terminate its award of a contract to Trident to supply printers, copiers and associated technical support and supplies for use aboard all ships in the United States Navy's massive fleet as part of DLA's Shipboard Multipurpose Device Program ("SMDP"). The contract had a <u>minimum</u> value of $131,530,317.00, but, based upon prior awards, was estimated to reach its maximum value of $194,000,000.00.

Trident solicited the Defendants to serve as its supplier and to otherwise assist Trident in preparation of a bid for Solicitation No. SP7000-19-R-1001 (the "Solicitation") issued by DLA regarding SMDP. The Solicitation's performance work statement ("PWS") contained at least two (2) requirements that, if strictly construed, rendered the thirty-five (35) year incumbent, Xerox, the

sole entity capable of submitting a technically acceptable bid.  Specifically, PWS Section 21.1.15 requires machines be in current production (the "current production requirement") and PWS Section 21.1.37 requires that all but two (2) classes of devices be supplied by a single manufacturer (the "single manufacturer requirement").

The Defendants did not *directly* manufacture two (2) types of high volume copiers (also called "production devices") required by the Solicitation and subject to the single manufacturer requirement. However, Defendants repeatedly represented to Trident that the single manufacturer requirement could be satisfied by "white labeling" machines principally manufactured by a third-party under contract with the Defendants.  In reliance upon these representations, Trident responded to the Solicitation proposing white labeled devices as its proposed production devices and representing HP as the single manufacturer.

In its review of Trident's submission, because the two (2) production devices were "white labeled" products not in the Defendants' main product line, DLA found no reference to the two (2) proposed production devices in HP's product offerings, and questioned whether the two (2) production devices were in current production at HP. In response to DLA's inquiry, the Defendants drafted and then transmitted to Trident for submission to DLA a certification dated December 10, 2020 (the "December 2020 Certification"), affirming that the two (2) production devices satisfied the Solicitation's current production requirement. A true and correct copy of the December 2020 Certification is attached hereto as **Exhibit 1**.  Relying upon the December 2020 Certification, DLA found Trident's proposal technically sufficient, and ultimately awarded the contract to Trident. Trident then purchased a quantity of devices from the Defendants and commenced testing the devices it would supply as required by DLA and the Navy, investing millions of dollars to do so.

On December 30, 2021, with no advanced warning and in contravention of its repeated prior representations (including as set forth in the December 2020 Certification), the Defendants issued a letter (the "December 2021 Letter") falsely suggesting that the December 2020 Certification was inaccurate and that Trident had provided it to DLA without the Defendants' knowledge or consent.  A true and correct copy of the December 2021 Letter is attached hereto as **Exhibit 2**. The statements made in the December 2021 Letter are materially false and/or misleading, and there was no legitimate justification whatsoever sending the December 2021 Letter to DLA.  Based upon the December 2021 Letter, DLA terminated Trident's SMDP contract <u>with cause</u>.  In so doing, the Defendants misconduct has not merely caused the termination of the SMDP contract, but jeopardized Trident's future as a government contractor.

Thus, the Defendants' illicit and actionable conduct has caused Trident to suffer damages in excess of $85,000,000.00 consisting of direct costs and expenses incurred in securing the contract award from DLA and commencing performance thereunder; lost profits; and the significant long term harm to Trident's business and reputation.  Because the Defendants' conduct was egregious and lacked any remotely good faith justification, Plaintiff should also be awarded substantial punitive damages in excess of $425,000,000.00.

<u>**Parties, Jurisdiction and Venue**</u>

1.      Plaintiff Trident is a limited liability company organized under the laws of Pennsylvania with its principal place of business located at 320 Circle of Progress, Pottstown, PA 19464.

2.      Plaintiff's sole member is non-party John Zvarick, an adult individual and resident of the Commonwealth of Pennsylvania.

3.      Trident is a certified small business government contractor that has successfully completed a number of significant contracts for various federal government agencies and branches of the armed services, supplying copiers and printers and attendant supplies and services.

4.      Defendant HP is a Delaware corporation with its principal place of business located at 1501 Page Mill Road, Palo Alto, California 94304. HP is a citizen of both Delaware and California. 28 U.S.C. § 1332(c)(1).

5.      HP is a multi-national corporation and successor to Hewlett Packard, Inc., a well-known branded manufacturer of technology products.

6.      As with most manufacturers, HP's products are made with physical components and software licensed by and/or purchased from third parties.

7.      HP also "white labels" many products, by purchasing a nearly finished product from another manufacturer, with authorization to modify, brand, market, sell and warranty that product as an HP product.

8.      Defendant HPI is a Delaware limited liability company with its principal place of business located at 1299 Pennsylvania Ave NW, Suite 475, Washington, DC 20004.

9.      Upon information and belief, the sole member of HPI is HP.  Therefore, HPI is also deemed a citizen of Delaware and California. C.T.  Carden v. Arkoma Associates, 494 U.S. 185, 195-196 (1990); accord, Navarro Sav. Ass'n v. Lee, 446 U.S. 458, 461, 100 S.Ct. 1779, 64 L.Ed.2d 425 (1980); Great S. Fire Proof Hotel Co. v. Jones, 117 U.S. 449, 455-56 (1990).

10.     HPI is a wholly owned subsidiary of HP, through which HP supplies goods and services to the federal government either as a direct government contractor or as a subcontractor or supplier to other businesses.

11.     In connection with this matter, Trident primarily interacted with HPI executives and employees.

12.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as the parties are citizens of diverse jurisdictions and the amount in controversy exceeds $75,000.00.

13.     A substantial part of the events or omissions giving rise to the instant claim occurred in this district. For example, but without limitation:

      a.     Trident is based in this district.

      b.     Trident prepared its response to the solicitation in this district.

      c.     Trident communicated with HP about the matters at issue from this district.

      d.     HP sent the December 2020 Certification to Trident in this district.

      e.     Trident sent the December 2020 Certification to DLA from this district.

      f.     The Defendants sent the tortious December 2021 letter to this district.

      g.     Trident received the December 2021 letter in this district.

      h.     Trident was harmed in and felt the effects of the Defendants' tortious conduct in this district.

14.     Venue is appropriate within the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1391(b)(2).

**Background Facts**

**A.  The SMDP Solicitation**

15.     For over thirty-five (35) years, Xerox has supplied the copiers and printers used aboard United States Navy ships, and has provided supplies and service for those machines.

16.     On February 8, 2019, as one of Xerox's many contracts related to Navy ship copiers and printers was scheduled to end, DLA issued the Solicitation, a true and correct copy of which is attached as **Exhibit 3**.

17.     Through the Solicitation, DLA sought bids to purchase "Single Function Devices (SFD), A3, A4 and Production Multifunctional Devices (MFD), Specialty Devices (SD), technical, analyst and support services, maintenance, parts, supplies and device training … for Navy afloat elements, Military Sealift Command (MSC) afloat elements, U.S. Fleet Marine Forces (FMF) afloat elements, Coast Guard and other mobile activities of the Federal Government that have deployment for extended periods." Ex. 3 at p. 2.

18.     The Solicitation was part of DLA's SMDP. Id. at cover sheet to attachment 1, the Statement of Work.

19.     From Plaintiff's perspective, the contract that had been historically awarded to Xerox for the past thirty-five (35) years had matured, and had come up for re-bid.

20.     The Solicitation anticipates the award of a single firm-fixed-price indefinite delivery, indefinite quantity ("IDIQ")[1] contract with a maximum value of $194,000,000.00. Id. at p. 2.

21.     The Solicitation states that the contract would be awarded to the offeror with the lowest priced, technically acceptable proposal ("LPTA"), subject to testing and approval. Id. at p. 2.

22.     To be technically acceptable, offerors were required to meet all Technical Factors and Subfactors (as defined in the Solicitation), which were each evaluated as "Acceptable" or

---

[1] An IDIQ contract essentially calls for the supplier to supply the contracted goods on an as-needed basis over the life of the contract, subject to a cap.

"Unacceptable." An "Acceptable" rating meant that the offeror "clearly demonstrate[d] the ability to provide and perform all services and technical requirements described in the [PWS]." Id. at p. 2.

23.     The Solicitation only required offerors to indicate that each proposed device satisfied the Solicitation. Offerors were not required to provide DLA with product specification sheets.

24.     The Solicitation's PWS sought twelve (12) device classes: Class I, Class IC, Class III, Class IIIC, Class IV, Class IVC, Black & White Printer (BWPR), Color Printer (CLRPR), Production Color (PC), Production Black & White (PBW), Specialty Device I (SDI), and Specialty Device II (SDII).

25.     Trident was aware that Xerox held the predecessor contracts to SMDP for over thirty-five (35) years.

26.     It was apparent from a review of the PWS in the Solicitation that Xerox successfully lobbied for the inclusion of requirements which, if strictly interpreted, would render it impossible for any other entity to submit a conforming response to the Solicitation. For example, PWS section 21 contains two (2) notable requirements:

- "Equipment shall be in current production as new equipment on the date of proposal submission and be in production for six months after contract award." Ex. 1, PWS § 21.1.15 (the "Current Production Requirement").

- "Class I-IVC & Production Devices must be a single manufacturer." Id., PWS §21.1.37 (the "Single Manufacturer Requirement").

27.     The Solicitation does not define any of the terms in PWS §§ 21.1.15 and 21.1.37. Exhibit 3, generally.

28.     "Single manufacturer" is also not defined in any statute, regulation, or Agency guidance.

29.     Thus, bidders were left to independently interpret these performance specifications.

**B. Trident Identifies HP as a Bid Submission Partner, Challenges the Solicitation and Submits a Proposal**

30.     Trident desired to submit a proposal to DLA in response to the Solicitation.

31.     Based upon the Solicitation's requirements, there was only a small number of businesses who could serve as Trident's supplier and/or partner on the project.

32.     In or about March 2019, after researching potential suppliers, Trident identified HP as a supplier with whom Trident might be able to develop a technically acceptable proposal in response to the Solicitation.

33.     That same month, Trident began working with HP, by and through its federal government contracting subsidiary HPI, to develop a proposal which met the unique PWS requirements in the Solicitation.

34.     Trident provided HP with a copy of the PWS, and asked HP to identify solutions to meet the PWS requirements across all device classes.

35.     From the outset of Trident's work with the Defendants, HPI president Todd Gustafson participated in the parties' discussions, and directed the Defendants' team working on the Solicitation.

36.     Together, the Defendants and Trident identified various problematic PWS requirements that, if strictly interpreted, prevent any non-Xerox bidder from receiving the award, as only Xerox produces every class of device subject to the single manufacturer requirement.

37.     For example, Defendants do not manufacture a production color or production black and white device that met the PWS requirement.

38.     However, beginning in March 2019, Defendants suggested that they source, modify, re-brand and warranty production devices from a third-party entity with whom HP had an existing contractual relationship—a process generally known as "white labeling."

39.     Trident, in consultation with HP, submitted an initial proposal to DLA in response to the Solicitation on April 19, 2019.

40.     The incumbent provider, Xerox, also submitted a proposal to DLA in response to the Solicitation on or about April 19, 2019.

41.     On that same date, believing the Solicitation to be flawed, Trident, through its bid protest/government contracts outside counsel, filed a bid protest before the Government Accountability Office ("GAO") challenging the unduly restrictive Solicitation requirements, and participated in a question and answer process seeking clarification of certain Solicitation requirements.

42.     As its *de facto* partner in the solicitation, Trident involved the Defendants in the preparation of the GAO pre-award protest, which involvement included, without limitation, deliberations, sharing draft filings with HPI executives (including Mr. Gustafson), and recurrently conferring with the Defendants' lead federal procurement personnel.

43.     Trident was ultimately successful in securing some modifications to the Solicitation, but DLA did not modify the single manufacturer requirement.

44.     At the same time, DLA did not further define the single manufacturer requirement, or prohibit "white labeling."

45.     As these processes ensued, and based upon discussions with DLA, Trident, in consultation with HP, refined its proposal in response to the Solicitation.

46.     Trident's modified proposal was based upon DLA's modifications to the Solicitation, as well as feedback received from DLA in response to on-going discussions between DLA and the entities submitting proposals (e.g., Trident and Xerox).

47.     In or about August 2019, the Defendants suggested the proposal include what the Defendants referred to as "special order devices" or "SPOs" for the two (2) production device classes subject to the single manufacturer requirement. The Defendants explained that at HP, SPOs generally referred to equipment primarily supplied to customers with very specific and unique needs, often in connection with government contracts.

48.     Defendants specifically proposed that Trident offer special order "variants" of Canon's imageRUNNER ADVANCE DX 8705i and the Canon imageRUNNER ADVANCE C7565i as production devices (which would ultimately be designated as HP SPO8116b and HP SPO3305c).

49.     The Defendants further explained that these Canon production devices were in current production at Canon and therefore available to the Defendants via HP's special ordering process attributable to the 35-year partnership between HP and Canon, pursuant to which Canon develops and manufactures components, print engines, laser printers and multifunction printer products which are ultimately marketed, branded and sold as HP products.

50.     Under the September 2009 Canon-HP Master Reseller Agreement, still in full force and effect, HP was expressly permitted to modify, rebrand and sell Canon devices as HP products, including, without limitation, Canon's in production imageRUNNER ADVANCE DX 8705i and the Canon imageRUNNER ADVANCE C7565i.

51.     The Defendants represented that these SPOs were manufactured by Canon, but for purposes of the SMDP Solicitation, HP would modify and configure the machines to meet DLA's

unique requirements and brand the machines as HP products, with HP literature and warranties, thereby rendering them technically compliant with the Solicitation's single manufacturer requirement.

52.     The Defendants represented that modification and rebranding of Canon products to meet government requirements was a standard industry practice, acceptable in bids on federal contract solicitations containing similar single manufacturer requirements.

53.     The Defendants argued that Canon was merely one of thousands of suppliers to HP, or was HP's "contract manufacturer" under DFARS 202.101, which defines a "contract manufacturer" as a "company that produces goods under contract for another company under the label or brand name of that company."

54.     Conversely, if the Solicitation's single manufacturer requirement excluded contract manufacturers, then only Xerox could fulfill that requirement, which would render the Solicitation subject to a successful protest.

55.     Nevertheless, Trident was internally concerned about these representations; Trident had no desire to impede its bright government contracting future or risk any other negative consequences of misrepresenting facts to the DLA in its response to the Solicitation.

56.     However, Trident relied upon Defendants' reassurances regarding the propriety of using Cannon as a contract manufacturer, the Defendants' sophistication and experience in the government contracting market, and the Defendants' well documented relationship with Canon; therefore Trident reasonably accepted the Defendants' representations regarding the special ordering process under which the SPOs were configured to be HP devices, and rendered compliant with the PWS requirements.

57.     Trident's own investigation confirmed the reasonableness of its reliance upon this representation.  For example, 10 U.S.C. § 2451, *et seq.,* establishes the Defense Standardization Program.  The Secretary of Defense implemented the Defense Standardization Program through the Department of Defense Standardization Manual, which establishes rebranding as an acceptable practice. Department of Defense Manual 4120.24, https://tinyurl.com/ya3mml8w, at 86-87, 105 (accessed February 25, 2022); see also DFARS 202.101.

58.     As Trident prepared its updated proposal in response to the Solicitation, the Defendants provided Trident with specification sheets for the HP SPO8116b and HP SPO3305c, which made it clear that these proposed devices were Canon devices to be supplied under HP's brand through HP's SPO process.

59.     Defendants also expressly approved Trident's use of the HP logo, approved HP labelling of the SPO devices, and reasserted that these devices would be modified and then branded and warrantied as HP devices configured to satisfy the Solicitation.  A true and correct copy of e-mail correspondence dated August 21, 2020 evidencing the aforesaid approvals is attached hereto as **Exhibit 4**.

60.     On August 21, 2020 the Defendants represented to Trident that the Defendants discussed the SMDP procurement with Canon, including the proposal to modify and rebrand Canon's imageRUNNER ADVANCE DX 8705i and the Canon imageRUNNER ADVANCE C7565i, as HP SPO8116b and HP SPO3305c for SMDP, and Canon expressly approved this proposal. Id.

61.     Defendants also represented to Trident at this time that Canon would continue to produce these models throughout the life of the SMDP program and source them to the Defendants, thus enabling the Defendants to produce HP SPO8116b and HP SPO3305c for Trident.

62.     In September 2019, in express reliance upon the Defendants' representations, Trident submitted a proposal in response to the Solicitation that included the HP SPOs as the proposed production devices. A true and correct copy of Trident's September 2019 proposal is attached hereto as **Exhibit  5**.

63.     Trident's September 18, 2019 proposal included the following devices for the twelve (12) device classes identified in the Solicitation:

| Device Class | Device |
|---|---|
| CLASS I | HP E52545 |
| CLASS IC | HP E57540 |
| CLASS III | HP E82540z |
| CLASS IIIC | HP E77830z |
| CLASS IV | HP E82550z |
| CLASS IVC | HP E87650z |
| Black & White Printer (BWPR) | HP M404dn |
| Color Printer (CLRPR) | HP M454dn |
| Production Color (PC) | HP SPO8116b |
| Production Black & White (PBW) | HP SPO3305c |
| Specialty Device I (SDI) | Noritsu QSS Green IV |
| Specialty Device II (SDII) | Noritsu QSS Green R |

Id.

64.     As noted above, the Solicitation merely required an applicant to state that each proposed device satisfied the Solicitation's requirements.  The Solicitation did not require the applicant to provide specification sheets for the devices proposed in the application. See Exhibit 3 at p. 3.

65.     Nonetheless, with the Defendants' knowledge and consent, Trident's September 18, 2019 proposal did include HP specification sheets for each device proposed including the two (2) SPO production devices.  See Exhibit 5.  With respect to the SPO8116b and SPO3305c, the

specification sheets made clear that the proposed devices were slightly modified Canon devices to be supplied under HP's brand through HP's SPO process.

**C. DLA'S Technical Review of Trident's Submission, and the Defendants' continuing support of Trident's efforts to secure the SMDP Contract, including its Issuance of the December 2020 Certification**

66.     After Trident submitted its revised proposal in September 2019, DLA conducted the first of multiple evaluations of Trident's proposed devices' compliance with the Solicitation's requirements.  DLA's evaluation process would ultimately continue until April of 2021.

67.     Because the prior Xerox contract expired, but the SMPD contract had not yet been awarded, let alone new machines being installed on Navy ships by the successful bidder, DLA made a series of unilateral, non-competitive contract awards to Xerox for services that were within the scope of the Solicitation, characterizing these awards as "sole source" awards in order to avoid competitive bidding contracting requirements.   DLA justified these non-competitive "sole source" awards by stating Xerox was the only company able to meet the technical requirements that were substantially similar to those in the separate SMDP Solicitation.

68.     Trident learned of these non-competitive awards in February 2020, and was concerned that if such awards went unchallenged, this would allow Xerox and/or individuals within DLA and the Navy to claim that Xerox was the only company able to meet the technical requirements.

69.     As a result, Trident considered seeking a temporary restraining order challenging the non-competitive Xerox awards before the Court of Federal Claims ("CoFC").

70.     For a second time, as its *de facto* partner in the solicitation, Trident involved the Defendants in deliberations, sharing draft filings with HPI executives (including Mr. Gustafson), and with the Defendants' counsel (Mr. Larry Gusman), particularly because DLA's representations could have far reaching consequences to all manufacturers, and could result in an organizational

lock out of all manufacturers that the parties fear could have a ripple effect to the SMDP procurement.

71.     At or about this time, Mr. Gustafson identified Larry Gusman, Esquire, as the Defendants' in house counsel assigned to this matter, and authorized Trident and its counsel (Michael Barnicle) to communicate and confer with Mr. Gusman regarding the Solicitation and bid protests.

72.     HP supported Trident's position in the proposed second bid protest and confirmed that the Defendants would support the second bid protest.

73.     On August 2, 2020, DLA's Contracting Officer ("CO") opened discussions with Trident regarding its most recent proposal, and provided its Evaluation Notice, a true and correct copy of which is attached hereto as **Exhibit 6.**

74.     The CO's Evaluation Notice noted that Trident failed to address PWS § 21.1.15 in its proposal, but did not cite PWS § 21.1.37 as a technical deficiency therein.  This was despite the specification sheets included in the proposal submission made clear that certain devices were "white labeled" Canon products.  Id.

75.     On August 21, 2020, with the Defendants' knowledge and consent, Trident responded to the CO's Evaluation Notice with a further revised proposal, wherein Trident "confirm[ed] that all proposed equipment is in current production and will be in production for six (6) months post award" in accordance with PWS Section 21.1.15.  A true and correct copy of Trident's August 21, 2020 revised proposal is attached hereto as **Exhibit 7.**

76.     Notwithstanding Trident's August 2020 response, DLA continued seeking additional documentation regarding Trident's proposed Production Devices (SPO8116b and SPO3305c).

77.     In October 2020, DLA engaged in direct discussions with the Defendants, communicating with HP Product Manager Karl Bennion.

78.     Mr. Bennion explained the special ordering process to DLA personnel.

79.     On November 19, 2020, the CO opened another round of discussions with Trident, and requested final proposal revisions via a second Evaluation Notice.  A true and correct copy of the CO's second Evaluation Notice is attached hereto as **Exhibit 8**.

80.     With respect to Trident's most recent proposal, the CO cited PWS § 21.1.15 as a "technical deficiency," and requested the following from Trident:

> Please provide documentation from Hewlett Packard showing the devices Trident proposes for SMDP Class PC (HP SPO8116b) and SMDP Class PBW (HP SPO3305c) are in current production by Hewlett Packard. We were not able to independently verify these devices are in current production by Hewlett Packard. To establish the requirement of PWS 21.1.15 is being met as, after researching, we are not able to independently verify the devices Trident proposes for SMDP Class PC (HP SPO8116b) and SMDP Class PBW (HP SPO3305c) are in current production. If possible, please provide documentation as to production timeline on the purposed production devices to align with PWS 21.1.15.

See Exhibit 8.

81.     Trident promptly forwarded DLA's communication to the Defendants, and discussed the communication with Defendants, including Mr. Gustafson.

82.     On November 25, 2020, at the direction of and/or with the approval of Mr. Gustafson, the Defendants provided Trident with a draft response intended to satisfy DLA's request for documentation from HP that both the Current Production Requirement and the Single Manufacturer Requirement were met by Trident's most recent proposal in response to the Solicitation.  A true and correct copy of the Defendants' email to Trident with a draft response to the DLA's inquiry is attached hereto as **Exhibit 9**.

83.     Trident and the Defendants collectively edited and refined the response.

84.     In an email dated November 30, 2020, HPI's Chief Technology Officer, Dr. Thomas Gardner, confirmed that the Defendants believed the two (2) special order devices satisfied the PWS requirements, writing:

> Agree with your way forward. The way I look at Cannon is they are just one of our ten thousand parts and component suppliers for our products. We share IP with several of the suppliers. Maybe one way to state this is as follows:
>
> HP is recognized as having a World Class Supply Chain. Currently they are the best in the IT market. As such they have close relationship among their ten thousand parts suppliers and component manufacturers. Several of these suppliers share intellectual property with HP. HP certifies that the quoted equipment is in current production and will be in production at least 6 months after award.

A true and correct copy of Mr. Gardner's November 30, 2020 email is attached hereto as **Exhibit 10**.

85.     Continuing to work cooperatively to achieve the shared goal of securing an award of the SMDP contract to Trident, and because it was HP's machines at-issue in the second Evaluation Notice, the Defendants, by and through Mr. Gardner, ultimately executed and delivered a letter dated December 10, 2020 addressed to the CO (i.e. the December 2020 Certification) in which the Defendants stated:

> This letter responds to your evaluation notice for entering into discussions letter dated November 19, 2020 ("Letter") concerning the technical requirements set forth in RFP No. SP7000-19-R-1001 ("SMPD RFP"), Performance Work Statement 12.1.15 ("PWS").
>
> Upon review of the Letter and PWS, HP certifies that the equipment Trident Engineering and Procurement ("Trident") proposes for SMDP Class PC (HP SPO8116b) and SMDP Class PBW (HP SPO3305c) are commercial items currently in production as new equipment as of the date of Trident's final revised proposal submission and will be in production for six months after contract award.

See Exhibit 1, the December 2020 Certification.

86.     Mr. Gustafson actively participated in the discussion about, drafting of and revisions to the December 2020 Certification. He authorized and approved of Mr. Gardner's execution of the December 2020 Certification and Trident's submission of the December 2020 Certification to DLA.

87.     On December 11, 2020, Trident submitted a final proposal revision, restating that "[p]roposed equipment are commercial items in current production as new equipment as of the date of this proposal and will be in production for six months after contract award."  A true and correct copy of Trident's December 11, 2020 final proposal revision is attached hereto as **Exhibit 11**.

88.     With Defendants' knowledge and consent, Trident supplied DLA with the December 2020 Certification (which was addressed directly to the CO at DLA) as confirmation from the Defendants that the equipment was in current production and would be for six (6) months after the contract award.   Id.

89.     Trident's final proposal revision of December 11, 2020 also included revised specification sheets for SPO8116b and SPO3305c prepared by Defendants that *again* made clear HP's proposal to re-brand the Canon devices referenced in Trident's September 18, 2019 proposal. These specification sheets stated that SPO8116b and SPO3305c were "[c]onfigured to comply with SP7000-R-19-1001 PWS." See Exhibit 11 at specification sheets for SPO8116b and SPO3305c.

90.     Thus, Trident and the Defendants were certainly not hiding from DLA the fact that they were proposing Canon devices specially configured to satisfy the Solicitation's requirements for Production Devices.

91.     On or about April 20, 2021, DLA determined Trident's proposal as technically acceptable, and thus provided Trident with information regarding the reverse auction to allow it to participate in the same. A true and correct copy of an email from DLA dated April 20, 2021 providing Trident (and others deemed technically acceptable) with information and instructions regarding the reverse auction is attached hereto as **Exhibit 12**; see also Exhibit 3 at p. 2 ("the Contracting Officer or his/her representative will provide offerors determined to be technically acceptable and in the competitive range with information concerning the auction process.")

92.     As Trident's proposal, including the specification sheets for the two (2) production devices, unambiguously indicate Trident's proposed use of "white label" versions of Canon devices, DLA's finding that Trident's proposal was technically acceptable constitutes DLA's approval of "white labeling" to satisfy the Single Manufacturer Requirement.

93.     Xerox had also been evaluated as technically acceptable.

**D. The Reverse Auction, the Contract Award to Trident and the Defeat of Xerox's Pre-Award and Post-Award Protests.**

94.     On April 26, 2021, DLA conducted a reverse auction to determine the lowest-priced offeror.

95.     During the reverse auction's "Blind Bid Period," Xerox submitted its best and final offer of $146,999,905.30 and Trident submitted its best and final offer of $131,530,317.00.

96.     The difference between the two (2) offerors' bids was ***$15,469,588.30***.  Trident's best and final offer was approximately ***11 percent (11%) lower*** than that of Xerox.

97.     On May 4, 2021, DLA's "Source Selection Authority" determined Trident's proposal to be the lowest-priced, technically acceptable proposal, making Trident the presumptive awardee.

98.     On May 6, 2021, Xerox filed an initial pre-award protest with the Government Accountability Office (GAO), challenging its exclusion from the competitive range. Xerox asserted two (2) protest grounds: first, "the Agency conducted a flawed reverse auction" and second, "the Agency improperly determined that another offeror [Trident] was capable of meeting all the technical requirements set forth in the solicitation."  A true and correct copy of Xerox's submission is attached hereto as **Exhibit 13**.

99.     Through its protest, Xerox sought to have Trident excluded from the SMDP competition as technically unacceptable, leaving Xerox as the awardee. Id.

100.    On May 14, 2021, Trident contacted Mr. Gustafson to solicit Defendants' assistance in opposing Xerox's protest (as HP had assisted in two prior protests) as Xerox was likely to challenge aspects of HP's devices that were within HP's particular purview as the manufacturer. Understanding Mr. Gusman was no longer with HP, Trident's counsel requested contact information for Mr. Gusman's replacement as Defendants' counsel regarding this matter.

101.    In response, Mr. Gustafson indicated that Defendants no longer had in-house government contracts counsel, but secured outside counsel – a former HP in-house attorney named Lisa Burke, Esq.

102.    Oddly, notwithstanding the Defendants' significant role in winning the Solicitation and with respect to the two (2) prior protests, Mr. Gustafson advised Trident's counsel that Defendants' counsel, Ms. Burke, was unwilling to be involved in the protest and declined to even speak with Trident's counsel.

103.    On May 24, 2021, Xerox filed a supplemental pre-award protest with the GAO, challenging its exclusion from the competitive range on the basis that DLA's technical and past

performance evaluations were unreasonable.  A true and correct copy of Xerox's supplemental submission is attached hereto as **Exhibit 14**.

104.    The gravamen of Xerox's challenge to DLA's technical evaluation was, shockingly, that the Solicitation's specifications were so unique that only Xerox could meet the requirements, to the exclusion of all other potential bidders. Essentially, Xerox argued that all other companies lacked Xerox's thirty-five (35) years of experience and technical know-how under the Navy's predecessor contracts.  Id.

105.    In its May 24, 2021 submission, Xerox took issue in particular with Trident's offer of "white labeled" HP SPO devices, contending that that they were actually Canon devices.  Id.

106.    DLA opposed Xerox's protests before the GAO.  With respect to Trident's compliance with PWS § 21.1.37, DLA stated:

> [A]ll Class I-IVC & Production devices proposed by Trident are, in fact, from a single manufacturer, specifically Hewlett-Packard. … Moreover, in accordance with the Solicitation, Trident submitted a statement stating it "agrees to comply with all sections set forth in the performance work statement without any caveats/deviations." … Thus, based on all the above (and contrary to Xerox's speculation), the SSEB's determination that Trident's proposal was technically "acceptable" with regard to the single manufacturer requirement ***under PWS § 21.1.37***, was reasonable and consistent with the stated evaluation criteria.…

A true and correct copy of DLA's opposition to Xerox's submissions is attached hereto as **Exhibit 15** (emphasis added).

107.    On August 16, 2021, the GAO denied Xerox's protests because DLA's "evaluation was reasonable and consistent with the terms of the solicitation and applicable statutes and regulations."  A true and correct copy of the GAO's August 16, 2021 decision is attached hereto as **Exhibit 16**.

108.   With respect to the Technical Evaluation, including assessment of the single manufacturer requirement, the GAO "considered all of Xerox's allegations and [found] no merit to any of them." Id.

109.   The GAO also found that Dr. Garner's December 10, 2020 letter "satisfied the agency's concerns" regarding the single manufacturer requirement. Id.

110.   On August 17, 2021, Trident's counsel contacted Mr. Gustafson to advise him of the successful defense of Xerox's protest, and requested HP's input concerning the release of information relative to HP's "white labeling" practices and HP's December 10, 2020 letter in the August 16, 2021 GAO decision under the GAO's redaction protocol.

111.   Rather than refer Trident to Ms. Burke, Mr. Gustafson directed the matter to the Defendants' Federal Contracts and Public Sector Compliance Manager, Regina Neuland.

112.   Consistent with the Defendants' prior representations throughout the solicitation process, Ms. Neuland advised Trident that the Defendants had no objection to the release of such information because HP-Canon's "white labeling" was widely known, including through disclosure of the HP-Canon agreements in HP's SEC filings. Ms. Neuland also understood "white labeling" to be an accepted practice in federal contracting. Correspondence with respect to the foregoing is attached hereto as **Exhibit 17**.

113.   After Trident's successful defeat of Xerox's pre-award protest, on August 20, 2021, DLA formally awarded the contract to Trident.  A true and correct copy of the contract award is attached hereto as **Exhibit 18**.

114.   Trident incurred in excess of $5 million in costs in connection with its efforts to secure an award of the SMDP contract, and in defending that award.

115.     Trident promptly commenced performance thereunder. Trident's initial work under the contract involved acquiring a quantity of devices, and supplying them to an independent testing lab, Dayton Brown, as required by the contract.

116.     HP delivered these testing devices, including several of the SPOs.

117.     To date, Trident has incurred hundreds of thousands of dollars in device testing costs. Exemplar invoices evidencing some of Trident's testing costs and expenses are attached hereto as **Exhibit 19**.

118.     On September 9, 2021, Xerox filed another bid protest before the Court of Federal Claims ("CoFC") and sought a temporary restraining order. The protest was docketed in the CoFC as Case No. 1:21-cv-01807-TMD.

119.     On September 17, 2021, following extensive briefing and oral arguments, CoFC denied Xerox's application for a temporary restraining order.

120.     On October 7, 2021, Xerox moved for discovery and to supplement the administrative record; Xerox specifically sought to depose HP and DLA personnel, seemingly with respect to the "white labeling" issues Xerox has focused on.

121.     On December 17, 2021, CoFC denied Xerox's motion in all material respects.

122.     As a result of these rulings, and in light of the record before CoFC and the standard of review applicable to an award protest, Xerox's second award protest was all but certain to fail.

E.  **The Defendants Issue the December 2021 Letter; DLA Issues an Order to Show Cause and Terminates the SMDP Contract.**

123.     On or about December 21, 2021, as Trident was celebrating the victories before CoFC, Defendants' outside counsel, Ms. Burke, suddenly indicated her desire to discuss SMDP procurement with Trident.

124.     Trident's counsel spoke with Ms. Burke on or about December 21, 2021.

125.    Astonishingly, Ms. Burke asked if the December 2020 Certification posed what she termed "compliance issues" with respect to the single manufacturer requirement, in light of the Defendants' "white labeling" of Canon machines.

126.    Subject to the limitations imposed on Trident's counsel by GAO and CoFC protective orders, counsel for Trident recounted as much of the history as he was able, noting the two (2) prior successful GAO protests, contract award, successful CoFC motions practice, likelihood of success in the CoFC protest, and that HP's Compliance Manager did not object to the December 2020 Certification or to Xerox's "white labeling" protest arguments several months earlier, in August 2021.

127.    There was no further communication between the Defendants and Trident on the subject.

128.    Without warning, and to the utter shock of Plaintiff, on December 30, 2021 the Defendants sent the December 2021 Letter signed by Mr. Gustafson to both Trident and DLA. See Exhibit 2.

129.    In the December 2021 Letter, the Defendants stated, in relevant part:

We understand that the [December 2020 Certification] may have been interpreted by the Government – including by the Government Accountability Office (GAO) in addressing a post-award protest filed by Xerox Corporation – to mean that the SMDP Class PC and SMDP Class PBW printers proposed by Trident are currently in production and branded by HP Inc.[] That is not the case; rather, the two devices are produced and branded by Canon, and, as you were aware at the time we submitted the December 10 Letter, HP Federal (and Trident) intended to resell those printers to satisfy the SMDP requirements.

HP Federal has recently been informed by a Trident representative that DLA is likely aware that the two aforementioned devices will be manufactured by Canon. Nevertheless, out of an abundance of caution, HP Federal is providing this letter to memorialize and clarify its intent with respect to these printers.

As a valued partner, HP Federal takes this matter seriously and are reviewing the business processes that led to submission of the December 10 Letter to Trident. We

will further supplement this submission as needed to the extent additional relevant facts are identified.

In the meantime, you should feel free to contact me directly to discuss this matter. HP Federal will concurrently inform DLA, as the recipient of December 2020 Letter, by forwarding this instant letter to the contracting officer.

See Exhibit 2.

130.    Reasonably outraged, Trident promptly reached out to Mr. Gustafson and Ms. Burke to inquire about the December 2021 Letter and the Defendants' election to issue the letter without prior notice to Trident.

131.    Trident communicated its fundamental disagreement with the representations made in the Defendants' December 2021 Letter, and the lack of justification for issuing the same.

132.    Neither Mr. Gustafson nor Ms. Burke promptly responded to Trident's urgent inquiries into the December 2021 Letter, which posed the risk of imploding the parties' mutually beneficial SMDP Contract after the defeat of Xerox's challenges was all but assured.

133.    The December 2021 Letter had an immediate chilling effect on the pending Xerox litigation in CoFC, Trident's relationships with government personnel, and its ability to communicate with DLA or government counsel.

134.    Most immediately, government counsel advised Trident of its intent to request a stay of the litigation to allow DLA to consider the December 2021 Letter, implying that DLA's position regarding Trident's contract award might change.

135.    On January 5, 2022, DLA issued a Show Cause Notice as a result of the December 2021 Letter, requiring a response by January 18, 2022. A true and correct copy of the Show Cause Notice is attached as **Exhibit 20**.

136.    Although Trident and HP were always forthcoming about the fact that the special order devices were modified Canon products and not manufactured by HP, the Show Cause Notice

indicated that if "both HP and Trident are reselling the Canon devices" then Trident's proposal was technically unacceptable, and Trident breached its contract with DLA. Id.

137.    The Show Cause Letter threatened to terminate Trident's SMDP Contract for default. Id.

138.    Trident promptly provided the Show Cause Notice to the Defendants. See **Exhibit 21**, which is a true and correct copy of email correspondence from Trident to the Defendants. As a sophisticated federal government contractor, Defendants knew that a Show Cause Notice is a very serious matter because its very issuance indicates a termination for cause is imminent.

139.    As a sophisticated federal government contractor, Defendants knew that a termination for cause is a drastic action with many severe far-reaching consequences impacting both current and future federal contracting opportunities as well as imposing significant legal hurdles to overcome for a prime contractor like Trident.

140.    As a sophisticated federal government contractor, Defendants knew that their participation in responding to the Show Cause Notice was essential to avoiding a termination for cause and that Trident could not adequately protect its interests alone in responding to the Show Cause Notice because the subject matter was within Defendants' particular purview and was the result of Defendants' improper actions.

141.    In response to Trident sharing the Show Cause Notice with the Defendants, on January 6, 2022, Ms. Burke contacted Trident's government contracts counsel.

142.    Ms. Burke claimed surprise at the impact of the December 2021 Letter, and stated her belief that the letter was an ordinary indication of "compliance."

143.     In apparent recognition of the tornado the ill-advised and false and/or misleading communication had set in motion, Ms. Burke advised that another of Defendants' outside counsel would handle the matter on a going forward basis.

144.     At or around this time, Trident advised the Defendants that Trident would submit a show cause response (the "Show Cause Response"), and requested the Defendants' assistance.

145.     Instead of challenging the Defendants before the government or filing a unilateral response that could be deemed adverse to the Defendants, Trident invited Defendants to amend the December 2021 Letter which might mitigate or otherwise avoid the consequences of the original December 2021 Letter.

146.     Thereafter, between January 7, 2022 and January 14, 2022, Trident's counsel conferred numerous times with Defendants' new outside counsel in an attempt to secure the Defendants' assistance in preserving the SMDP award about which Trident and Defendants fought so hard to achieve, and which already cost Trident millions of dollars.

147.     During these discussions, Defendants' counsel asked Trident to provide documents and information reflecting the parties' understanding of the SMDP Solicitation, including the "white labeling" construct.

148.     This information was already in the Defendants' possession, and *originated* with the Defendants, causing Trident to question whether the Defendants were communicating with Trident in good faith.

149.     Nevertheless, believing the Defendants shared Trident's desire to avoid contract termination, and trusting the Defendants' prior representations and active role in the project, Trident provided the requested information.

150.    Trident similarly drafted its Show Cause Response in contemplation of Defendants' cooperation.

151.    However, on January 14, 2022, the last business day before the due date of the Show Cause Response, Defendants' outside counsel claimed that "HP is unable to provide further clarification to the Dec. 30, 2021 letter at this time." A true and correct copy of the Defendants counsel's January 14, 2022 email is attached hereto as **Exhibit 22**.

152.    As a sophisticated government contractor, Defendants knew their inaction and lack of participation in the Show Cause Response guaranteed the Contract being terminated for cause and the devastating results to Trident that would stem therefrom.

153.    On January 17, 2022, Trident submitted its Show Cause Response. Trident's Show Cause Response is attached as **Exhibit 23**.

154.    In its Show Cause Response Trident advised DLA that Trident stood by the representations made in the proposal; explained the HP special ordering process; stated that Trident did not believe HP's December 2021 Letter was a repudiation of HP's December 2020 Certification; and confirmed that Trident intended to continue performance. Id.

155.    On January 21, 2022, Trident was advised that its SMDP Contract would be terminated as a result of Trident's alleged misrepresentations (which "misrepresentations" were made in express reliance upon *the Defendants' representations to Trident they contradicted in the December 2021 Letter*).

156.    On January 26, 2022, DLA formally terminated the contract for cause. DLA's contract modification terminating the contract for cause is attached as **Exhibit 24**.

157.    The modification states, in its entirety: "The contract is terminated for cause due to the contractor's failure to comply with the contract terms and conditions set forth in PWS

§§ 21.1.15 and 21.1.37. The Contractor shall be liable to the Government for any and all rights and remedies provided by law."

158.   Thus, the Defendants misconduct has not merely resulted in the loss of Trident's SMDP Contract, but has harmed Trident's reputation with DLA; placed into jeopardy its ability to secure future government contracts; and placed it as risk of liability to the Government.

## COUNT I
## TORTIOUS INTERFERENCE WITH CONTRACT

159.   Trident repeats and realleges the allegations of each of the foregoing paragraphs as if set forth in full herein.

160.   The elements of tortious interference with the contract are: (1) the existence of a contractual relation between the complainant and a third-party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct.  Strickland v. University of Scranton, 700 A.2d 979, 985 (Pa. Super. 1997).

161.   "One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract." Adler, Barish, Daniels, Levin & Creskoff v. Epstein, 393 A.2d 1175, 1183 (Pa. 1978). The duty of non-interference applies whether or not there is a contract with a third-party. See RESTATEMENT (SECOND) OF TORTS § 766 cmt. (b) (1979)("there is a general duty not to interfere intentionally with another's reasonable business expectancies of trade with third persons, whether or not they are secured by contract").

162.    The Defendants tortiously interfered with Trident's SMDP Contract with DLA when the Defendants issued the December 2021 Letter.

163.    The Defendants' issuance of the December 2021 Letter ultimately caused and induced DLA to terminate its award of the SMDP Contract to Trident by expressly stating and/or directly implying that Trident's and the Defendants' prior representations that the SPO devices complied with the single manufacturer requirement as well as the "in production" requirement were false.

164.    The statements made by the Defendants in the December 2021 Letter were materially and knowingly false, and were contradicted by the Defendants' numerous prior representations throughout the parties' three-year working relationship.

165.    Notably, the Defendants drafted and knowingly executed the December 2020 Certification for the express purpose of resolving DLA concerns regarding the Current Production Requirement and Single Manufacturer Requirement, and expressly authorized Trident to submit the December 2020 Certification to DLA for this purpose.

166.    Then, in August 2021, the Defendants' Director of Compliance also confirmed the Defendants' understanding and belief, as repeatedly represented to Trident, that white labeled products were a permitted means of satisfying the single manufacturer requirement.

167.    In issuing the December 2021 Letter, the Defendants ignored their repeated representations to Trident, including, without limitation, those in November 2020, those in the December 2020 Certification, and that of their Director of Compliance, all indicating that white labeled products, such as the SPO devices, were a permitted means of satisfying a single manufacturer requirement in a government contract.

168.    There is no legitimate privilege or justification for the Defendants' conduct.

169.    The Defendants claimed that they issued the December 2021 Letter out of concern regarding "compliance" requirements, but such claimed justification is utterly baseless, because four (4) months earlier, the Defendants' *Director of Compliance* made clear that the Defendants had no compliance concerns with any aspect of the Solicitation, including, specifically, the December 2020 Certification.

170.    As a result of the Defendants' conduct, Trident has suffered massive actual losses, which include, but are not limited to:

a.      The loss of its more than $5 million dollar investment in seeking and defending an award of the SMDP;

b.      The more than $500,000.00 incurred in performing under the SMDP;

c.      Lost profits under the SMDP which were estimated to exceed $50 million;

d.      Potential exclusion from future government contracts and/or monetary damages payable to the United States due to the termination for cause; and

e.      Damage to Trident's business and reputation from the loss of this massive contract, the performance of which would have solidified Trident's industry status as a high performing government contractor.

171.    The Defendants' actions in tortiously interfering with the SMDP were willful and wanton.

172.    The Defendants' knowledge of the impropriety of their actions and the intentional nature of their misconduct is evidenced by the facts that the Defendants issued the December 2020 Letter without advanced notice to Trident, and the Defendants refused to correct their misdeed.

173.    Accordingly, Trident should also be awarded substantial punitive damages to deter the Defendants from engaging in similarly improper conduct in the future.

WHEREFORE, Trident demands judgment in its favor and against HP and HPI jointly and severally, in an amount not less than $85,000,000.00, punitive damages in an amount not less than $425,000,000.00, and together with such other and further relief as this Honorable Court deems just and warranted.

## COUNT II
## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

174.    Trident repeats and realleges the allegations of each of the foregoing paragraphs as if set forth in full herein.

175.    To make out a claim for tortious interference with prospective economic advantage, Plaintiff must allege "(1) a prospective contractual relationship; (2) the purpose or intent to harm the plaintiff by preventing the relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage resulting from the defendant's conduct." Salsgiver Communs., Inc. v. Consol. Communs. Holdings, 150 A.3d 957, 964, 2016 Pa. Super. 244 (Pa. Super. 2016)(citing and quoting Foster v. UPMC South Side Hosp., 2010 Pa. Super. 143, 2 A.3d 655, 665 (Pa. Super. 2010)).

176.    In federal government contracting, a contractor's past performance is an evaluation factor considered by the contracting office in virtually all solicitations. See e.g. Exhibit 1 at p. 4 of 45:

> **Past Performance:** Offeror is required to submit information, on a single page, identifying federal, and/or state and/or local Government and/or private contracts performed within the past three years, which are similar in scope and complexity to the effort described in this solicitation. In the case of an offeror without a record of relevant past performance or for whom information on past performance is not available, the offeror shall state none. Submit no more than three customer references for work performed that is relevant and similar in scope to this requirement. Include reference names, telephone numbers, email addresses, and a brief description of the work performed.

In addition, the contracting officer will review the System for Award Management (SAM),the Federal Awardee Performance and Integrity Information System (FAPIIS) repositories, and the Past Performance Information Retrieval System (PPIRS) in accordance with FAR 9.104-6(a), to determine contractor responsibility prior to making any award.

Past performance shall be used as an evaluation factor within the LPTA process, unless waived by the Procurement Contracting Officer, in accordance with FAR 15.101-2(b). Past performance shall be evaluated in accordance with FAR 15.305 and DFARS 215.305.

However, the comparative assessment in FAR 15.305(a)(2)(i) does not apply. Therefore, past performance will be rated on an "acceptable" or "unacceptable" basis using the ratings below.

177.    When the federal government terminates a contract for cause, in addition to subjecting the contractor to a potential action for monetary damages, the contractor is placed at risk for formal debarment proceedings.

178.    More practically, the federal government maintains multiple databases containing information regarding a contractor's past performance (e.g. SAM, FAPIIS, CPARS).  Thus, even when a contractor is not formally debarred, a contractor who has had a prior contract terminated "for cause" is unlikely to be found "acceptable" in a pass/fail evaluation or even on comparative assessment.

179.    Trident is a federal government contractor, and thus actively solicits federal government contracts, as well as contracts with state, local, and foreign governments.

180.    As such, Trident has prospective contractual relationships with the federal government, as well as state, local and foreign governments, as each actively solicit vendors via formal solicitation processes.

181.    Trident has spent many years establishing a positive history of past performance, and has progressively and satisfactorily completed contracts of increasing complexity and cost.

182.     Satisfactory completion of the massive, and decade long SMDP Contract would have solidified Trident's past performance reputation, allowing it to not only achieve an "acceptable" rating on pass/fail type past performance assessments, but to also receive high marks on those potential awards applying the comparative assessment process established by FAR 15.305(a)(2)(i).

183.     The Defendants tortiously interfered with Trident's prospective contractual relationships with the federal government, as well as local, state and foreign governments when individually, or collectively, the Defendants (a) issued the December 2021 Letter, and (b) failed and refused Trident's request that they rescind the same.

184.     The Defendants' issuance of the December 2021 Letter, and its refusal to rescind the same, caused and induced DLA to terminate its award of the SMDP Contract to Trident <u>with cause</u> by expressly stating and/or directly implying that Trident's and the Defendants' prior representations that the SPO devices complied with the single manufacturer requirement and the "in production" requirement were false.

185.     The statements made by the Defendants in the December 2021 Letter were materially and knowingly false, and were contradicted by the Defendants' numerous prior representations throughout the parties' three-year working relationship.

186.     Most notably, the Defendants drafted and knowingly executed the December 2020 Certification for the express purpose of resolving DLA concerns regarding the current production requirement and single manufacturer requirement, and expressly authorized Trident to submit the December 2020 Certification to DLA for this purpose.

187.    Then, in August 2021, the Defendants' Director of Compliance also confirmed the Defendants' understanding and belief, as repeatedly represented to Trident, that white labeled products were a permitted means of satisfying the single manufacturer requirement.

188.    In issuing the December 2021 Letter, the Defendants ignored their repeated representations to Trident, including, without limitation, those in November 2020, those in the December 2020 Certification, and that of their Director of Compliance, all indicating that white labeled products, such as the SPO devices, were a permitted means of satisfying the single manufacturer requirement in a government contract.

189.    There is no legitimate privilege or justification for the Defendants' issuance of the December 2021 Letter.

190.    As a result, Trident gave the Defendants an opportunity to attempt to avoid the consequences of their misconduct, by inviting them to work with Trident in preparing the Show Cause Response to create a new document rescinding the December 2021 Letter.

191.    After feigning interest in cooperating with Trident in this regard, the Defendants ultimately claimed that "HP is unable to provide further clarification to the Dec. 30, 2021 letter at this time."

192.    As a result, based upon the Defendants' December 2021 Letter, Trident's SMDP Contract was terminated with cause.

193.    As a result, Trident is likely to be found "unacceptable" in a pass/fail evaluation, and thus is at material risk of not being awarded future government contracts.

194.    As a result of the Defendants' tortious conduct, Trident has suffered significant damages, which include, but are not limited to:

a.   Its considerable investment in establishing an exemplary history of past performance;

b.   Loss of future government contracting revenue based upon its past performance and its successful completion of the massive SMDP contract; and

c.   Damage to Trident's business and reputation from the loss of the massive SMDP contract, the performance of which would have solidified Trident's industry status as a high performing government contractor.

195.   The Defendants' actions in tortiously interfering with the SMDP were willful and wanton.

196.   The Defendants' knowledge of the impropriety of their actions and the intentional nature of their misconduct is evidenced by the facts that the Defendants issued the December 2021 Letter without advanced notice to Trident, and the Defendants refused to correct their misdeed.

197.   Accordingly, Trident should also be awarded substantial punitive damages to deter the Defendants from engaging in similarly improper conduct in the future.

WHEREFORE, Trident demands judgment in its favor and against HP and HPI jointly and severally, in an amount not less than $85,000,000.00, punitive damages in an amount not less than $425,000,000.00, and together with such other and further relief as this Honorable Court deems just and warranted.

**COUNT III**
**FRAUD**
**(asserted in the alternative to Count I and Count II)**

198.   Trident repeats and realleges the allegations of each of the foregoing paragraphs as if set forth in full herein.

199.   The elements of fraud under Pennsylvania law are "(1) a material factual misrepresentation; (2) made with knowledge or belief of its falsity; (3) with the intention that the other party rely thereon; (4) resulting in justifiable reliance to that party to his detriment." Agathos v. Starlite Motel, 60 F.3d 143, 147 (3d Cir. 1995); see also Moser v. DeSetta, 589 A.2d 679, 682 (Pa. 1991); Mellon v. Barre-National Drug Co., 636 A.2d 187, 189 (Pa. Super. 1993).

200.   Fraud can consist of "anything calculated to deceive, whether by single act or combination or by suppression of truth or suggestion of what is false." Moser, 589 A.2d at 682.

201.   Between March 2019 and December 2021, Defendants represented to Trident that Trident's proposal to provide special order devices as the SMDP production devices by modifying and "white labeling" Canon machines was an acceptable means of satisfying the Solicitation's Single Manufacturer Requirement and Current Production Requirement.

202.   Most notably, the Defendants drafted, executed and delivered to Trident for submission to DLA the December 2020 Certification, in order to resolve DLA's concerns that the special order devices rendered Trident's submission not technically acceptable with respect to the Single Manufacturer Requirement and/or the Current Production Requirement.

203.   If Defendants' statements in the December 2021 Letter that HP did not manufacture the two (2) special order devices are true, then the Defendants' representations from March 2019 through December 2021 were knowingly false and fraudulent.

204.   The Defendants made such apparent misrepresentations with the intention that Trident rely upon them in the submission of its various proposals for the SMDP award.

205.   Trident reasonably and justifiably relied upon these false representations of Defendants, and as a result thereof has suffered substantial damages.

206.   Such damages include, but are not limited to:

a.    The loss of its more than $5 million dollar investment in seeking and defending an award of the SMDP;

b.    The more than $500,000.00 incurred in performing under the SMDP;

c.    Lost profits under the SMDP which were estimated to exceed $50 million;

d.    Potential exclusion from future government contracts and/or monetary damages payable to the United States due to the termination for cause; and

e.    Damage to Trident's business and reputation from the loss of this massive contract, the performance of which would have solidified Trident's history as a high performing government contractor.

207.    The Defendants' fraudulent misrepresentations were willful and wanton, justifying the imposition of substantial punitive damages to deter the Defendants from engaging in similar glaringly improper conduct in the future.

WHEREFORE, Trident demands judgment in its favor and against HP and HPI jointly and severally, in an amount not less than $85,000,000.00, punitive damages in an amount not less than $425,000,000.00, and together with such other and further relief as this Honorable Court deems just and warranted.

**COUNT IV**
**FRAUDULENT INDUCEMENT**
**(asserted in the alternative to Count I and Count II)**

208.    Trident repeats and realleges the allegations of each of the foregoing paragraphs as if set forth in full herein.

209.    The elements of fraud in the inducement are (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5)

justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused

by the reliance. Eigen v. Textron Lycoming Reciprocating Engine Div., 2005 Pa. Super. 141, 874

A.2d 1179, 1185 (Pa. Super. 2005) (quotation marks and quotation omitted).

210.    Between March 2019 and December 2021, Defendants represented to Trident that

Trident's proposal to provide special order devices as the SMDP production devices by modifying

and "white labeling" Canon machines was an acceptable means of satisfying the Solicitation's

single manufacturer requirement and current production requirement.

211.    Most notably, the Defendants drafted, executed and delivered to Trident for

submission to DLA the December 2020 Certification, in order to resolve DLA's concerns that the

special order devices rendered Trident's submission not technically acceptable with respect to the

single manufacturer requirement and/or the current production requirement.

212.    If Defendants' statements in the December 2021 Letter that HP did not manufacture

the two (2) special order devices are true, then the Defendants' representations from March 2019

through December 2021 were knowingly false and fraudulent.

213.    The Defendants made such apparent misrepresentations to induce Trident to partner

with them regarding the SMDP Solicitation, and with the intention that Trident rely upon them in

electing to partner with the Defendants regarding the SMDP Solicitation, including the submission

of its various proposals for the SMDP award.

214.    Had Defendants not made the false representations, Trident would not have entered

into a *de facto* partnership with the Defendants regarding the SMDP program.

215.    Trident reasonably and justifiably relied upon these false representations of

Defendants, and as a result thereof has suffered substantial damages.

216.    Such damages include, but are not limited to:

a.    The loss of its more than $5 million dollar investment in seeking and defending an award of the SMDP;

b.    The more than $500,000.00 incurred in performing under the SMDP;

c.    Lost profits under the SMDP which were estimated to exceed $50 million;

d.    Potential exclusion from future government contracts and/or monetary damages payable to the United States due to the termination for cause; and

e.    Damage to Trident's business and reputation from the loss of this massive contract, the performance of which would have solidified Trident's history as a high performing government contractor.

217.   The Defendants' fraudulent misrepresentations intended to induce Trident to partner with the Defendants regarding the Solicitation were willful and wanton, justifying the imposition of substantial punitive damages to deter the Defendants from engaging in similar glaringly improper conduct in the future.

218.   All damages flowing from Trident's *de facto* partnership with Defendants should be awarded as a result of Defendants' fraudulent inducement of Trident into this arrangement.

WHEREFORE, Trident demands judgment in its favor and against HP and HPI jointly and severally, in an amount not less than $85,000,000.00, punitive damages in an amount not less than $425,000,000.00, and together with such other and further relief as this Honorable Court deems just and warranted.

## COUNT V
## DEFAMATION

219.   Trident repeats and realleges the allegations of each of the foregoing paragraphs as if set forth in full herein.

220.     "A *prima facie* case for defamation requires the plaintiff to plead the following: (1) the defamatory character of the communication; (2) publication of the communication to a third-party; (3) the communication refers to the plaintiff; (4) the third-party's understanding of the communication's defamatory character; and (5) injury."  <u>Brown v. Blaine</u>, 833 A.2d 1166, 1173 n. 14 (Pa. Commw. 2003)(citing 42 Pa. C.S.A. § 8343).

221.     "[I]t is well-settled law that a communication which ascribes to another conduct, character, or a condition that would adversely affect his fitness for the proper conduct of his business, trade, or profession, is defamatory *per se*.  Where there is any doubt that the communication disparages or harms the complainant in his business or profession, that doubt must be resolved in favor of the complainant; even where a plausible innocent interpretation of the communication exists, if there is an alternative defamatory interpretation, it is for the jury to determine if the defamatory meaning was understood by the recipient."  <u>Pelagatti v. Cohen</u>, 370 Pa. Super. 422, 438-39, 536 A.2d 1337 (Pa. Super. 1987)(internal citations omitted).

222.     The December 2021 Letter states that Trident misrepresented to the United States that the special order devices complied with the Current Production Requirement and the Single Manufacturer Requirement, and further states, or at worst implies, that Trident mislead the United States by and through its submission of the Defendants December 2020 Certification. See <u>Exhibit 1</u>.

223.     The December 2021 Letter specifically refers to Trident when it states:

> We understand that the [December 2020 Certification] may have been interpreted by the Government – including by the Government Accountability Office (GAO) in addressing a post-award protest filed by Xerox Corporation – to mean that the SMDP Class PC and SMDP Class PBW printers proposed by Trident are currently in production and branded by HP Inc.[] That is not the case; rather, the two devices are produced and branded by Canon, and, as you were aware at the time we submitted the December 10 Letter, HP Federal (and Trident) intended to resell those printers to satisfy the SMDP requirements.

See Exhibit 2.

224.    While nominally directed at Trident, the December 2021 Letter was also sent to DLA, which was the true intended recipient thereof.

225.    The Defendants' assertion that Trident made misrepresentations to the United States in order to secure the SMDP contract is defamatory *per se* as it indicates that Trident was deceitful and lied to the United States for pecuniary gain.

226.    Trident has suffered substantial damages as a result of the HP Defendant's defamation; to wit:

    a.    The loss of its more than $5 million dollar investment in seeking and defending an award of the SMDP;

    b.    The more than $500,000.00 incurred in performing under the SMDP;

    c.    Lost profits under the SMDP which were estimated to exceed $50 million;

    d.    Potential exclusion from future government contracts and/or monetary damages payable to the United States due to the termination for cause; and

    e.    Damage to Trident's business and reputation from the loss of this massive contract, the performance of which would have solidified Trident's history as a high performing government contractor.

227.    The Defendants' fraudulent misrepresentations were willful and wanton, and thus justify the imposition of substantial punitive damages to deter the Defendants from engaging in similar glaringly improper conduct in the future.

WHEREFORE, Trident demands judgment in its favor and against HP and HPI jointly and severally, in an amount not less than $85,000,000.00, punitive damages in an amount not less than $425,000,000.00, and together with such other and further relief as this Honorable Court deems just and warranted.

Respectfully submitted,

**SILVERANG, ROSENZWEIG**
**& HALTZMAN, LLC**

By: /s/ William C. Katz
   Philip S. Rosenzweig, Esquire
   William C. Katz, Esquire
   Genevieve McCormack, Esquire
   PA Atty ID Nos. 62461/205086/201172
   *Attorneys for Plaintiff*